Arnold Schildhaus v. Commissioner.
Schildhaus v. Commissioner
Docket No. 1422-65.
United States Tax Court
T.C. Memo 1969-283; 1969 Tax Ct. Memo LEXIS 9; 28 T.C.M. (CCH) 1463; T.C.M. (RIA) 69283; December 23, 1969, Filed *9 Petitioner had exclusive control over the checking accounts of several corporations. Respondent determined that certain unexplained disbursements and unexplained bank deposits of these corporations were diverted to petitioner's personal use, and therefore, were includable in his gross income. Held: 1. Petitioner sustained his burden of proving that respondent's determination was erroneous with respect to 14 of the disbursement items. However, the remaining unexplained disbursements are includable in his gross income for 1954. 2. Petitioner has shown that Unity Estates, Inc. net deposits being charged to him should be reduced in the amount of $77.56. In addition, petitioner has sustained his burden of proving that respondent erred in his determination that certain alleged net deposits of House Realty Corp. During 1955 are chargeable to petitioner. In all other respects, respondent's deficiency determination for 1955 is upheld. 3. Petitioner failed to introduce any evidence showing that respondent erred in asserting various additions to petitioner's tax for the years 1954 and 1955. Consequently, respondent's determination with respect to such additions is sustained. 4. Petitioner is *10 foreclosed from asserting the statute of limitations as a defense in this case by virtue of the Second Circuit's opinion in Schildhaus v. Commissioner [67-1 USTC 9147], 370 F. 2d 549 (C.A. 2, 1966), certiorari denied 387 U.S. 924 (1967). 5. Respondent's abatement of previously made assessments does not prevent him from making new assessments as the result of deficiencies found herein. 6. Petitioner has not been denied due process of law. Arnold Schildhaus, pro se, 680 W. 239th St., Bronx, N. Y. Agatha L. Vorsanger, for the respondent. STERRETT
Memorandum Findings of Fact and Opinion STERRETT, Judge: The Commissioner determined deficiencies and additions to petitioner's income tax liability for the calendar years 1954, 1955, and 1956, in the following amounts: PENALTIES
Taxable Year
Deficiency
Sec. 294(d)
Sec.
Sec.
Sec.
Ended
(1) (A)IRC
6654(a)IRC
6653(a)IRC
6651(a)IRC
1939
1954
1954
1954
12/31/54
$3,550.00
$328.38
none
$177.50
$ 887.50
12/31/55
2,602.78
none
$ 72.87
130.14
650.70
12/31/56
2,602.78
none
72.87
130.14
650.70
Total
$8,755.56
$328.38
$145.74
$437.78
$2,188.90 Respondent has conceded that there is no deficiency in petitioner's income tax for the year 1956. The issues remaining for our decision are as follows: *11 1464 (1) Whether certain unexplained disbursements from the checking accounts of three corporations controlled by petitioner were diverted to petitioner's personal use, and are therefore includable in his gross income for the year 1954. (2) Whether various unexplained net deposits to the checking accounts of corporations controlled by petitioner were diverted to petitioner's personal use, and are consequently includable in his gross income for the year 1955. (3) Whether petitioner is liable for asserted additions to his tax for the taxable years 1954 and 1955 under the provisions of section 294(d)(1)(A) of the Internal Revenue Code of 1939, and sections 6651(a), 6653(a), and 6654(a) of the Internal Revenue Code of 1954. [1]
(4) Whether petitioner may assert the statute of limitations as a defense in the instant case. (5) Whether respondent's abatement of previously made assessments for the years in issue operates to prevent him from making new assessments as a result of the deficiencies at issue herein. (6) Whether petitioner has been denied due process of law. Findings of Fact At the *12 time of filing his petition herein, Arnold Schidhaus (hereinafter referred to as petitioner) had his legal residence in New York, New York. Sometime prior to the years here involved, petitioner acquired all of the stock of three New York corporations; namely, Unity Estates, Inc., Emray Realties, Inc., and Mae Ed Realty Corp. (hereinafter referred to as Unity, Emray, and Mae Ed respectively). Unity owned an apartment building located at 1117 Tinton Avenue, New York City, and Emray owned another apartment building located at 212 West 141st Street in New York City. Emray and Mae Ed were dissolved by proclamation of the secretary of state of New York on the respective dates of December 15, 1953 and December 15, 1947. The New York Department of State, Division of Corporations, had no record of a dissolution of Unity prior to or during the years here involved. During the years 1954 and 1955, Unity maintained a checking account at Royal State Bank of New York (hereinafter referred to as Royal State Bank), and Emray and Mae Ed had checking accounts with Commercial State Bank and Trust Company (hereinafter referred to as Commercial State Bank). Rent collections from the apartment buildings *13 at West 141st Street and Tinton Avenue were deposited in one or more of these three accounts during 1954, and were deposited in Unity's account during 1955. At all times relevant hereto, petitioner had exclusive control over the bank accounts and financial affairs of Unity, Emray and Mae Ed. Petitioner did not maintain any corporate books regarding the financial affairs of Unity, Emray or Mae Ed. However, he did retain some bills, bank statements, checks and check stubs of these corporations. Unity did not issue two $500 checks made payable to "Cash" on the 10the and 21st of January 1954. Unity, Emray and Mae Ed frequently made loans to one another, and made loan payments to various banks for one another. On July 6, 1954, Unity made a $1,400 loan to Mae Ed and Mae Ed on the same day loaned Emray $1,500 so that Emray could repay a loan in the amount of $1,500 at Commercial State Bank. Emray loaned Unity $600 on September 21, 1954, and Unity made a $250 partial repayment to Emray on October 14, 1954. Unity loaned Emray $500 on November 16, 1954. On June 4, 1954, Mae Ed loaned Unity $1,200. During the years 1950 through 1953, Mae Ed borrowed substantial sums of money from Commercial State *14 Bank. On January 28th, February 2d, and June 2d of the year 1954, Emray made $500 installment payments to Commercial State Bank in partial repayment of the sums borrowed by Mae Ed. On May 3, 1954, Emray transferred $500 to Mae Ed which in turn made a $500 installment payment on its loan at Commercial State Bank. Various tenants of the Tinton Avenue apartment building filed a lawsuit for false arrest against petitioner and Mae Ed in what was alleged to be their respective capacities as manager and owner of said building. The City Court of the City of New York entered judgment in favor of the plaintiff-tenants, and petitioner and Mae 1465 Ed appealed therefrom. On March 16, 1954, Mae Ed paid $1,200 to the plaintiff-tenants, by check payable to their attorney Joseph J. Allen, in consideration for their release of petitioner and Mae Ed from all causes of action which said plaintiff-tenants may have against them. On September 21, 1954, the Sheriff of Bronx County, New York, levied execution upon certain real and personal property of petitioner and Mae Ed to satisfy the City Court's judgment in the false arrest case. Unity borrowed money from The National City Bank of New York (hereinafter *15 referred to as National City Bank). Payments on this loan were payable in the amount of $11.05 due on the 14th of every month. On May 24, 1955, Unity made a payment of $44.20 to National City Bank representing four installments on this loan. Unity also paid two more installments on this loan in the total amount of $22.10 on August 17, 1955 to National City Bank. Mae Ed purchased Frigidaire equipment from General Motors Acceptance Corporation (hereinafter referred to as G.M.A.C.) to be delivered at the Tinton Avenue building. Unity made a payment to G.M.A.C. on November 29, 1955 in the amount of $11.26 in partial payment of Mae Ed's debt with G.M.A.C.
Petitioner was an officer of a corporation known as House Realty Corp. (hereinafter referred to as House Realty). During the year 1955, he had exclusive control over the bank accounts and financial affairs of House Realty. No deposits were made to any House Realty bank account during 1955. In 1956, special agent Shaeiwitz of the internal revenue service, intelligence division, investigated petitioner for potential criminal violations with respect to his taxes for the years 1954 and 1955. Shaeiwitz subpoenaed from petitioner the cancelled *16 checks and bank statements of Unity, Emray, and Mae Ed. Based upon the checks and bank statements produced by petitioner and a bank statement and loan records he secured from Royal State Bank and Commercial State Bank, Shaeiwitz prepared work sheets reflecting the following: (1) Unity's disbursements from and deposits to its checking account with Royal State Bank for the years 1954 and 1955; (2) Emray's disbursements from and deposits to its checking account with Commercial State Bank for the year 1954; (3) Mae Ed's deposits to and disbursements from its checking account with Commercial State Bank for the years 1954 and 1955. The work sheet reflecting Unity's deposits to its account with Royal State Bank during 1955 shows gross deposits of $30,623.03, which amount includes $15,690 attributable to money borrowed by Unity from Royal State Bank and Mae Ed. There is no evidence that Shaeiwitz investigated deposits made during 1955 by House Realty, or that he prepared any work sheets with respect to that corporation. On the work sheets reflecting disbursements, Shaeiwitz attempted, on the bais of petitioner's representations and his own speculation as to what an item might be, to categorize *17 each check under one of three headings, namely, "Loans and Exchanges," "Expenses," or "Arnold Schildhaus, Personal." With respect to the deposit work sheets, he placed those items which he had verified to be loans under a "Loans and Exchanges" column. Shaeiwitz also made various notations on the work sheets indicating endorsements on disbursement items and the source of various deposits. Shaeiwitz was unable to determine a satisfactory explanation as to some items, and the work sheets remained incomplete with respect thereto. At the conclusion of his investigation, special agent Shaeiwitz recommended against the prosecution of petitioner for tax fraud. Following Shaeiwitz' investigation and before the issuance of the statutory notice dated December 22, 1959, Harry Gotwisner, appellate division, internal revenue service, held several conferences with petitioner. During the course of these conferences, petitioner was given the opportunity to explain various disbursements from and deposits to the checking accounts of Unity, Emray, and Mae Ed for the years 1954 and 1955. At this time, petitioner prepared his own work sheets setting forth an item by item explanation of the 1954 and 1955 *18 disbursements. Based upon his conferences with the petitioner and information developed by special agent Shaeiwitz and a revenue agent, Gotwisner prepared a report which forms the basis for the deficiency determinations involved herein. Respondent's determination against petitioner for 1954 is premised upon the following unexplained disbursements which respondent alleges were diverted to petitioner's personal use: 1466 Checks drawn on the account of Unity at the Royal State Bank: Date of Check
Payee
Amount
1954
Jan. 10
Cash
$ 500.00
21
Cash
500.00
28
Cash
50.00
Feb. 10
Cash
50.00
13
Cash
50.00
Mar. 1
Cash
40.00
14
Cash
50.00
10
Cash
40.00
31
Cash
500.00
31
Cash
485.00
Feb. 19
American Express Co., Miami, Florida
60.45
Mar. 29
Arnold Schildhaus
475.00
29
Arnold Schildhaus
600.00
July 6
Mae Ed Corp.
1,400.00
Sept 20
Royal State Bank
1,700.00
Oct. 13
Emray Realty Corp.
250.00
13
Dr. B. P. Watson
25.00
15
Dr. Arthur J. Rosenthal
40.00
29
Mt. Sinai Hospital
58.00
Jan. 10
* General Motors Acceptance Corp.
24.48
Feb. 10
* General Motors Acceptance Corp.
24.48
Mar. 10
* General Motors Acceptance Corp.
24.48
May 14
* General Motors Acceptance Corp.
24.48
June 10
* General Motors Acceptance Corp.
24.48
July 8
* General motors Acceptance Corp.
24.73
Oct. 4
* General Motors Acceptance Corp.
16.68
Nov. 10
* General Motors Acceptance Corp.
30.00
May 5
Unknown
500.00
Nov. 16
Unknown
500.00
Total Checks
$8,067.26
*19 Less: Repavment of loans evidenced by cancelled notes: Sept. 20
$1,700.00
Oct. 19
2,000.00
Mar. 29
1,200.00
4,900.00
Balance
$3,167.26 1467 Checks drawn on the account of Emray at Commercial State Bank: Date of Check
Payee
Amount
1954
Jan. 4
A. Schildhaus
$ 500.00
15
A. Schildhaus
50.00
15
Orbach's
15.60
20
A. Schildhaus
50.00
28
A. Schildhaus
500.00
Feb. 2
A. Schildhaus
500.00
Mar.19
Saks - Fifth Ave.
8.19
25
R. H. Macy
18.42
29
Cash
500.00
Apr. 8
A. Schildhaus
50.00
19
M. Lubow (Hospitalization)
35.40
26
Bureau of Motor Vehicles
19.75
May. 3
Mae Ed Corporation
500.00
June 2
A. Schildhaus
500.00
July 7
MacDove Lincoln Motors, Inc.
500.00
Sept10
*General Motors Acceptance Corp.
24.73
21
Unity Estates, Inc.
600.00
Oct.14
Unknown
500.00
Nov.18
Unknown
500.00
Dec. 6
Unknown
500.00
Total
$5,872.09
Checks drawn on the account of Mae Ed at the Commercial State Bank: Date of Check
Payee
Amount
1954
Mar. 18
Joseph J. Allen
$1,200.00
Apr. 21
* *20 General Motors Acceptance Corp.
24.48
May 3
Commercial State Bank
500.00
June 4
Unity Estates, Inc.
1,200.00
24
A. Schildhaus
60.00
July 6
Emray Realty Corp.
1,500.00
Nov. 18
Murray A. Mickenberg
425.00
Total
$4,909.48 1468 Based upon the foregoing unexplained disbursements, respondent determined that petitioner realized unreported gross income for 1954 of $13,948.83, as set forth below: Total of Unity's Unexplained Disbursements
$8,067.26
Less: Loan Repayments
4,900.00
$ 3,167.26
Total of Emray's Unexplained Disbursements
5,872.09
Total of Mae Ed's Unexplained Disbursements
4,909.48
Unreported income - 1954
$13,948.83
Respondent's determination against petitioner for 1955 is founded upon an analysis of net bank deposits allegedly diverted to petitioner's use and resulting in unreported income for 1955 of $11,490.53, as follows: Net deposits (after excluding loans and exchanges): Unity
$14,957.03 [2] *21 Mae Ed
13.02
House Realty Corp.
1,445.00
Rental Deposits
$16,415.05
Less: Allowance for business ex- penses - 30% of Rental In-
4,924.52
come
Unreported Income
$11,490.53
On December 22, 1959, respondent issued a statutory notice asserting deficiencies in petitioner's income tax for the years 1954, 1955, and 1956 as a result of petitioner's alleged diversion of the above-mentioned corporate funds to his personal use. In injunction proceedings instituted by the petitioner in the District Court followed by two appeals to the Second Circuit, petitioner succeeded in enjoining the government from collection of the alleged deficiencies on the basis that the statutory notice was not mailed to his last known address. See Schildhaus v. Moc, 319 F. 2d 587 (C.A. 2, 1963), and Schildhaus v. Moe, 335 F. 2d 529 (C.A. 2, 1964). On December 18, 1964, respondent issued the statutory notice involved herein determining deficiencies and adjustments to petitioner's income tax for 1954, 1955, and 1956 identical in all material respects to the statutory notice dated December 22, 1959. Petitioner then filed a petition in this Court wherein he relied upon the statute of limitations as a defense. Respondent filed a motion requesting that petitioner be required to make a "further and better statement" with respect to his statute of limitations defense. This *22 Court granted respondent's motion and entered an order requiring petitioner to make a further or better statement of his defense or show cause why such defense should not be stricken from his petition. Petitioner failed to comply with this order and after two hearings on the matter, we dismissed petitioner's case for failure to prosecute. Petitioner appealed to the Second Circuit from our order of dismissal. Since petitioner did not file an appeal bond as provided by section 7485, the respondent assessed the deficiencies asserted in the statutory notice dated December 18, 1964. The Second Circuit held that while we would be justified in striking petitioner's statute of limitations defense from the petition, we erred in dismissing the case on its merits. Schildhaus v. Commissioner, 370 F. 2d 549 (C.A. 2, 1966), certiorari denied 387 U.S. 924 (1967). With respect to petitioner's statute of limitations defense, the Second Circuit said in part: * * * Having failed to comply with the simple requests of the Commissioner and the Tax Court to say when he filed the returns in question, Schildhaus may no longer raise the defense of the Statute of Limitations. * * * Following the Second Circuit's *23 reversal of our order of dismissal, respondent abated the deficiencies previously assessed pending the outcome of this proceeding. Opinion Thus it is, after a decade of tortuous preliminary litigation before this Court, the District Court, and the Second Circuit, we have the opportunity of passing for the first time upon the merits of petitioner's income tax liabilities for the years 1954 and 1955. Respondent has made a determination herein that various unexplained disbursements from the Unity, Emray, and Mae Ed checking accounts during 1954 and various net deposits to the Unity, Mae Ed and House Realty checking accounts during 1955 were diverted to petitioner's personal 1469 use, and consequently, are includable in his gross income. Petitioner contends that respondent's determination is erroneous on the basis that the disbursements and deposits at issue are chargeable to one or more of the businesses involved herein, rather than to himself. Although the record before us indicates that Emray and Mae Ed were dissolved by proclamation of the secretary of state of New York prior to the years involved herein, this fact appears to have no bearing upon our disposition of this case. The parties *24 have orally stipulated that petitioner had exclusive control over the bank accounts of Unity, Emray, Mae Ed and House Realty. In deciding whether disbursements from or deposits to these accounts are of a business or a personal nature, it would seem to be immaterial whether these businesses were being operated in the form of a corporation or a sole proprietorship. The difficulty of deciding this case has been compounded by a combination of factors. First, petitioner's refusal to enter into a written stipulation of facts and his ill-prepared and disorganized presentation of his case has resulted in a bulky and muddled record. Secondly, the checks and bank statements relating to the disbursements and deposits at issue are missing. Each party blames the other for the loss, and, of course, we have no way of knowing or divining who is at fault. Consequently, in deciding this case, we have had to resort to secondary evidence; i.e., the work sheets special agent Shaeiwitz prepared inter alia from the checks and bank statements submitted to him prior to their loss. It is patent that the burden of proving respondent's determination to be erroneous rests squarely on the shoulders of the petitioner. *25 Rule 32, Tax Court Rules of Practice. At the trial of this case, petitioner offered his own testimony that specific items were of a business rather than a personal nature. Although respondent did not call any witnesses, there is testimony from special agent Shaeiwitz and conferee Gotwisner to the effect that they thoroughly investigated the Unity, Mae Ed and Emray disbursement and deposit items and charged to petitioner only those items which appeared to be personal. Since petitioner's testimony is contradicted in part by the testimony of Shaeiwitz and Gotwisner, and in view of the disorganized state of petitioner's testimony, the passage of fifteen years since the events in controversy, and the absence of any contemporaneous records with which petitioner could refresh his recollection of those events, we have, with one exception, accepted his testimony only where it is corroborated by extrinsic evidence of probative value. Cf. Jay A. Williams, 28 T.C. 1000 (1957). The one exception relates to the net deposits of House Realty for 1955. In this instance, respondent's determination was unsupported by any work sheets, testimony, or other evidence in the record, and petitioner's testimony *26 was clear and credible. In several instances, we have looked to the work sheets prepared by Shaeiwitz for corroboration of petitioner's testimony. We have no reason to believe that Shaeiwitz inaccurately listed the disbursement and deposit items on the work sheets, and we consider the work sheets probative of the fact that certain disbursements from and deposits to specific checking accounts were made on given dates. We have also relied to some extent upon Shaeiwitz' notations concerning endorsements which appeared on the checks and the source of the deposits. However, we have accorded little weight to the categorization of various items, by reason of their being listed in the loan, expense, or personal columns of the work sheets, since Shaeiwitz testified that this was done on the basis of petitioner's representations and his own speculation as to what particular items might represent. Issue 1. Unexplained Check Disbursements for 1954 We hold that petitioner has successfully carried his burden of proving that respondent's determination was erroneous with respect to the following disbursements made during 1954: Item No.
Date of
Drawer
Payee
Amount
Check Year 1954
1.
Jan. 10
Unity
Cash
$ 500.00
2.
Jan. 21
Unity
Cash
500.00
3.
July 6
Unity
Mae Ed
1,400.00
4.
Oct. 13
Unity
Emray
250.00
5.
Nov. 16
Unity
Unknown
500.00
6.
Jan. 28
Emray
* *27 A. Schildhaus
$ 500.00
7.
Feb. 2
Emray
* A. Schildhaus
500.00
8.
May 3
Emray
Mae Ed
500.00
9.
June 2
Emray
* A. Schildhaus
500.00
10.
Sept. 21
Emray
Unity
600.00
11.
Mar. 18
Mae Ed
Joseph J. Allen
1,200.00
12.
May 3
Mae Ed
Commercial State Bank
500.00
13.
June 4
Mae Ed
Unity
1,200.00
14.
July 6
Mae Ed
Emray
1,500.00 1470 Petitioner testified that Unity did not issue the above-listed $500 checks allegedly drawn by that corporation on the 10th and 21st of January 1954. In support thereof, petitioner produced check stubs for the checks issued by Unity throughout the period commencing January 1, 1954, and ending January 21, 1954. Stubs for the two $500 items are not present therein, nor do these items appear on the government work sheets listing Unity's disbursements during 1954. Respondent offered no evidence to rebut petitioner's testimony with the possible exception of Gotwisner's nebulous testimony that the unexplained disbursements were derived from various unidentified sources in addition to the work sheets. Petitioner went as far as he could toward proving a negative (i.e., that the checks were never issued). "The law imposes much less of a burden upon a taxpayer who is called upon to prove a negative - for example, that he did not receive the income which the Commissioner claims - than it imposes upon a taxpayer who is attempting to sustain a deduction on his return." [Footnote omitted] 9 Mertens, Law of Federal Income Taxation, sec. *28 50.61, p. 157. See also Clapp v. Commissioner, 321 F. 2d 12, 14 (C.A. 9, 1963), affirming 36 T.C. 905 (1961). Petitioner's evidence was sufficient to overcome the presumption of correctness attaching to respondent's determination, and, since respondent did not go forward with any evidence of the existence of such checks, these items should not be included in petitioner's gross income for 1954. In explanation of the items numbered 3 and 14 above, petitioner stated that on July 6, 1954, Unity made a $1,400 loan to Mae Ed and Mae Ed in turn loaned Emray $1,500 to enable that corporation to repay a $1,500 business loan from Commercial State Bank. Consistent with petitioner's explanation, we note that the payee on Unity's $1,400 check is Mae Ed and the payee on Mae Ed's $1,500 check is Emray. In addition, the government work sheets bear out petitioner's testimony. The Mae Ed work sheet for 1954 shows a deposit to Mae Ed of $1,400 on July 6, and a disbursement to Emray of $1,500 on that same date. Moreover, there is a notation thereon to the effect that the disbursement to Emray was endorsed over to the Commercial State Bank for payment of a loan due July 7, 1954. Although it appears that *29 these funds traveled a rather circuitous route, we are satisfied that they found their way to Commercial State Bank rather than petitioner's pocket. With respect to the above-listed items numbered 4 and 10, petitioner explained that on September 21, 1954, Emray loaned Unity $600 and that the $250 disbursement from Unity to Emray on October 13, 1954, was in partial repayment of that loan. Again, the payees on the two checks are consistent with petitioner's testimony, and the government work sheets reflect a deposit of $600 to Unity on September 21, 1954, with a notation of "Emray" beside it, and a deposit of $250 to Emray's account on October 14, 1954, with a notation of "Unity Estates, Inc." adjacent thereto. It is not an uncommon practice for related corporations to make inter-corporate loans among one another. This fact together with petitioner's credible testimony on this score compels us to reject respondent's contention that these items are somehow includable in petitioner's gross income. Petitioner testified that item 5 above represents a $500 loan to Emray from Unity on November 16, 1954. The payee is designated "Unknown." Shaeiwitz testified that he employed this designation *30 where the payee's name was illegible. The government work sheets show a deposit to Emray's checking account on November 16th in the amount of $500. We are therefore inclined to accept petitioner's explanation of this disbursement. 1471 As regards the above-numbered items 6, 7, 8, 9, and 12, petitioner stated that these disbursements represented loans from Emray to Mae Ed enabling Mae Ed to make $500 installment payments on amounts owed by Mae Ed to Commercial State Bank. Petitioner introduced loan records of Commercial State Bank showing that Mae Ed did indeed borrow substantial sums from Commercial State Bank throughout the years 1950 to 1953. Although the payee on checks 6, 7, and 9 is "A. Schildhaus," notations on Emray's work sheet for 1954 indicate that these checks were endorsed to the order of Commercial State Bank. We view these endorsements as an important factor linking these disbursements to Commercial State Bank. As will appear later, we have disallowed other alleged $500 installments on these loans where the only connection with Commercial State Bank is petitioner's uncorroborated testimony. With respect to items 8 and 12 above, the chain of payments from Emray to Mae *31 Ed to Commercial State Bank is connected with very strong links. The payees on these two May 3d disbursements are Mae Ed and Commercial State Bank respectively, and the Mae Ed work sheet reflects a deposit of $500 from Emray on May 3, 1954. In connection with item number 11 above, respondent orally stipulated that Joseph J. Allen is an attorney who represented various plaintiff-tenants in a lawsuit brought against petitioner and Mae Ed for false arrest. Petitioner introduced into evidence a printed record of the case which had been prepared for appeal purposes. This exhibit clearly shows that Joseph J. Allen, attorney, did represent various tenants of the Tinton Avenue apartment building in a false arrest case against petitioner and Mae Ed in their respective capacities as manager and owner of said building. Moreover, petitioner produced documents dated March 16, 1954, [3] *32 releasing petitioner and Mae Ed from all causes of action the plaintiffs may have against them in consideration for the sum of $1,200. These two exhibits strongly support petitioner's testimony concerning the date, payee, amount, and business purpose of this check. Respondent introduced documents showing that on September 21, 1954, subsequent to the date of the releases, the sheriff of Bronx County levied execution on the property of petitioner and Mae Ed in satisfaction of the plaintiff's judgment against them by the City Court of the City of New York. The record fails to reveal why execution was levied after the plaintiff-tenants had given petitioner and Mae Ed a release. However, in our view, the petitioner has demonstrated by a preponderance of the evidence that the $1,200 disbursement on March 16th was made for business rather than personal reasons and, consequently, should not be included in his gross income. Finally petitioner testified that the item numbered 13 above represents a loan from Mae Ed to Unity of $1,200 on June 4, 1954. The payee of this check is Unity, and the Unity work sheet for 1954 shows a deposit in Unity's checking account of $1,200 received *33 from Mae Ed on June 4th. We hold that petitioner has failed to sustain his burden of proof with respect to the below-listed 1954 disbursements: Item No.
Date of
Drawer
Payee
Amount
Check Year-1954
15.
Jan. 28
Unity
Cash
$ 50.00
16.
Feb. 10
Unity
Cash
50.00
17.
Feb. 13
Unity
Cash
50.00
18.
Mar. 1
Unity
Cash
40.00
19.
Mar. 14
Unity
Cash
50.00
20.
Mar. 10
Unity
Cash
40.00
21.
Mar. 31
Unity
Cash
500.00
22.
Mar. 31
Unity
Cash
485.00
23.
Feb. 19
Unity
American Express Co.
60.45
Miami, Florida
24.
Mar. 29
Unity
Arnold Schildhaus
475.00
25.
Mar. 29
Unity
Arnold Schildhaus
600.00
26.
Oct. 13
Unity
Dr. B. P. Watson
25.00
27.
Oct. 15
Unity
Dr. Arthur J. Rosenthal
40.00
28.
Oct. 29
Unity
Mt. Sinal Hospital
58.00
29.
May 5
Unity
Unknown
500.00
30.
Jan. 4
Emray
A. Schildhaus
500.00 1472 Item No.
Date of
Drawer
Payee
Amount
Check Year-1954
31.
Jan. 15
Emray
A. Schildhaus
$ 50.00
32.
Jan. 15
Emray
Orbach's
15.60
33.
Jan. 20
Emray
A. Schildhaus
50.00
34.
Mar. 19
Emray
Saks-Fifth Ave.
8.19
35.
Mar. 25
Emray
R. H. Macy
18.42
36.
Mar. 29
Emray
Cash
500.00
37.
Apr. 8
Emray
A. Schildhaus
50.00
38.
Apr. 19
Emary
M. Lubow (Hospitalization)
35.40
39.
Apr. 26
Emray
Bureau of Motor
19.75
Vehicles
40.
July 7
Emray
Mac Dove Lincoln Motors, Inc.
500.00
41.
Oct. 14
Emray
Unknown
500.00
42.
Nov. 18
Emray
Unknown
500.00
43.
Dec. 6
Emray
Unknown
500.00
44.
June 24
Mae Ed
A. Schildhaus
60.00
45.
Nov. 18
Mae Ed
Murray A. Mickenburg
425.00
Petitioner *34 testified that the above-numbered checks 15 through 22 plus 29 were never issued by Unity. However, he failed to produce Unity's check stubs for this period, or any other evidence of a corroborative nature to substantiate his testimony. Petitioner asserted that items 24, 25, and 36 above represented a $500 loan from Emray to Unity on March 29, 1954, enabling Unity to make a $1,075 payment on a $1,500 loan at Corn Exchange Bank. We cannot accept petitioner's testimony regarding these three March 29th items because it is not tightly woven with extrinsic evidence, but instead is easily unraveled exposing several loose ends. The payees do nothing to substantiate petitioner's testimony since the payee is "Arnold Schildhaus" on Unity's two checks and "Cash" on Emray's check. While the work sheets do show a $500 deposit in Unity's checking account on March 29, 1954, there is no notation of the source of this deposit. In addition, the record is barren of any evidence that would support petitioner's testimony that Unity had borrowed money from Corn Exchange Bank, or that Corn Exchange Bank had received a $1,075 payment from Unity. Finally, petitioner's testimony was somewhat vague, particularly *35 with respect to the loan at Corn Exchange Bank. With respect to items 30, 41, 42 and 43 above, petitioner attempted to show that these $500 payments were made by Emray to Commercial State Bank. The payee on these disbursements is not Mae Ed or Commercial State Bank, but either unknown or "A. Schildhaus." Moreover, there is no evidence of any endorsement to Commercial State Bank. We deem petitioner's uncorroborated and somewhat uncertain testimony concerning these items to provide an insufficient nexus between these disbursements and Commercial State Bank. Petitioner identified the checks numbered 31, 33, 37, and 44 above, all of which were payable to "A. Schildhaus," as being reimbursements to himself for out of pocket expenses incurred in buying supplies and paying the $50 bi-weekly salary of a superintendent at the two apartment buildings. Petitioner's own work sheet conflicts with his explanation of which specific items are attributable to supplies and which for salary. Even were this not so, we can accord little or no weight to petitioner's work sheet inasmuch as it was not prepared contemporaneously with the disbursements recorded therein, but several years subsequent thereto. *36 Additionally, due to the passage of fifteen years from the issuance of such disbursements, we think it unlikely that petitioner could accurately recall his disposition of the funds obtained from cashing $50 or $60 checks payable to himself. With respect to item 37, petitioner relies in his brief upon a notation reading "Supplies Cashed 1117 Tinton" appearing adjacent to this disbursement item on the Emray work sheet. He argues in his brief that this item is apparently an endorsement supporting his testimony that this money was expended for supplies. We disagree. When noting an endorsement, Shaeiwitz used the words "Endorsed" or "Pay to the order of" a specific payee. It is just as reasonable to assume that Shaeiwitz was merely noting what petitioner told him this item represented. In view of the foregoing, items 31, 33, 37, and 44 should be charged to petitioner's personal income. 1473 Petitioner testified that item 40 was a $500 payment for a car purchased for a handyman in order to enable him to travel between the Tinton Avenue and 141st Street apartment buildings. Again, petitioner failed to buttress his testimony with a bill of sale, testimony from the handyman, or any other *37 corroborative evidence whatsoever. As to the remaining unexplained disbursements listed above, petitioner either conceded these items to be personal or his testimony was so vague as not to warrant any discussion herein. Therefore, these remaining items are properly includable in petitioner's gross income for 1954. One 1954 item yet remains for our discussion. We did not include Unity's disbursement of $1,700 to Royal State Bank on September 20, 1954, on either of the two foregoing lists. As we understand it, petitioner has not been charged with this item because respondent has deducted from Unity's unexplained disbursements a loan repayment of $1,700 on September 20th, which was evidenced by a cancelled note. Issue 2. Unexplained Bank Deposits for 1955 Respondent's deficiency determination for 1955 is based upon the following net bank deposits of Unity, Mae Ed, and House Realty (adjusted for respondent's concession that Unity's net deposits should be $14,933.03) which respondent alleges to have been diverted to petitioner's personal use: Net deposits (after excluding loans and exchanges)
Unity Estates, Inc.
$14,933.03
Mae Ed Corp.
13.02
House Realty Corp.
1,445.00
$16,391.05
Rental Deposits
Less: Allowance for business expenses - 30% of rental
4,917.32
income
Diverted Income
$11,473.73
In *38 support of his net deposits determination for Unity of $14,933.03, respondent relies upon Shaeiwitz' work sheet reflecting Unity's deposits to its checking account with Royal State Bank during 1955. This work sheet reflects gross deposits of $30,623.03, but further indicates that $15,690 of such deposits was attributable to amounts borrowed by Unity from Royal State Bank and Mae Ed, resulting in the net deposits figure of $14,933.03. In further reduction of the net deposits chargeable to petitioner, respondent has made an allowance for the business expenses of Unity, Mae Ed, and House Realty in an amount equal to 30 percent of their net deposits after excluding loans and exchanges. Unity's proportionate share of this business expense allowance is $4,479.91 (30 percent times $14,933.03). In order for petitioner to prove that respondent's determination was erroneous with regard to Unity's net deposits for 1955, it was incumbent upon him to show one or more of the following: (1) that the net deposits being charged to him included amounts borrowed by Unity which are not included in the $15,690 already allowed by respondent; (2) that Unity's actual business expenses for 1955 exceeded the *39 $4,479.91 estimate allowed by respondent; (3) that Unity made nonpersonal disbursements (other than for business expenses) which should be allowed as an offset against Unity's net deposits. Petitioner offered no proof concerning (1) above, but he did offer some evidence of Unity's business expenses and other disbursements made by Unity during 1955. Unfortunately for petitioner, his evidence fails to support a conclusion that he is entitled to any amount for business expenses in addition to that already allowed by respondent. However, we do find that he is entitled to an additional reduction in the amount of $77.56 from the Unity net deposit figure being charged to him. As explained later, this $77.56 represents business disbursements which do not fall within the business expense classification. First, regarding Unity's business expenses for 1955, petitioner introduced Shaeiwitz' work sheet reflecting Unity's disbursements from its checking account with Royal State Bank during 1955. This work sheet, if proven to be accurate, would indicate that Unity's business expenses were significantly higher than the amount allowed by respondent. However, as previously explained, we cannot, in the *40 absence of supporting evidence from petitioner, accord any weight to Shaeiwitz' allocation of the disbursement items to the loan, expense, or personal categories shown on the work sheets. Petitioner did offer testimony concerning forty-one disbursement items appearing in the "Arnold Schildhaus, Personal" column of Unity's disbursements work sheet for 1955. His testimony, if assumed to be wholly accurate, would support a conclusion that twenty-two of these items [4] 1474 totaling $1,478.67 represented business expenses of Unity for 1955. In addition, petitioner produced at trial ten folders of bills to substantiate various items appearing on the Unity disbursements work sheets for 1955. We gave petitioner the opportunity of setting forth in his brief a schedule of those bills which he relied upon to support the work sheet disbursement items. Excluding one $27 disbursement to Abalone Exterminating Co., which was already covered by petitioner's testimony concerning the items appearing in the "Personal" column, petitioner's schedule, if assumed to be wholly accurate, shows that eighteen additional disbursements items totaling $2,724.06 represented business expenses of Unity for 1955. Thus, *41 taking petitioner's testimony and the bills together, petitioner has only offered evidence that Unity's business expenses for 1955 were $4,202.73. This amount is $277.18 below the amount previously allowed by respondent for Unity's business expenses, and therefore, respondent's determination in this respect should be sustained. Finally, with respect to Unity's disbursements other than those for business expenses, petitioner testified that seven checks to "A. H. Rubin" in the amount of $103.75 each should be offset against Unity's net deposits. He explained that he had loaned Unity $8,000 and produced a mortgage for that amount which he had taken on the Tinton Avenue property. He further testified that the seven disbursements represented Unity's mortgage payments to him, which he had requested to be made payable to A. H. Rubin, a landlord to whom he owed money. Petitioner's *42 testimony provides the only link between his loan to Unity and the disbursement items payable to "A. H. Rubin." We cannot accept this testimony without some corroboration. Petitioner's schedule indicates four separate disbursements from Unity in partial repayment of a loan obtained from National City Bank and four more disbursements by Unity for Frigidaire equipment purchased by Mae Ed for the Tinton Avenue building. However, a thorough examination of the ten folders of bills reveals substantiation for only three of these eight items, as follows: Date of Check
Payee
Amount
Substantiation
Year - 1955
May 24
National City Bank
$44.20
Bill dated May 6th for
$44.20
Aug. 17
National City Bank
22.10
Bill dated Aug. 5th showing
account in arrears in the
amount of $22.10
Nov. 29
G.M.A.C.
11.26
Frigidaire Order Form and
Conditional Sale Contract;
Bills showing $5.63 due
Oct. 12th and another $5.63
due Nov. 12th.
Total
$77.56
Substantiated
Disbursements These three substantiated items represent disbursements made by Unity which are not current business expenses, and are therefore not covered by respondent's allowance for business expenses. Consequently, we hold that these three items totaling $77.56 should be applied *43 to reduce the Unity net deposits for 1955 which are being charged to petitioner's gross income. They relate to a business expense of Unity, a validly existing corporation, although presumably of a capital nature. In all other respects, respondent's determination regarding Unity's net deposits for 1955 is hereby sustained. No evidence was proffered by petitioner regarding Mae Ed's net deposits of $13.02. Consequently, petitioner has failed to carry his burden of proof with respect to this item, and we sustain respondent's determination that Mae Ed's net deposits for 1955 are includable in petitioner's gross income. As regards House Realty's alleged net deposits of $1,445, petitioner gave credible testimony that no deposits whatsoever were made to the House Realty account during 1955. Once again, petitioner was placed in the difficult position of proving a negative (i.e., that no deposits were made to the House Realty account during 1955), and the burden upon him should be less stringent than if he were claiming a deduction. Clapp v. Commissioner, supra.1475 We hold that petitioner's clear and uncontradicted testimony was sufficient to destroy the presumption of correctness that attached *44 to respondent's determination concerning the House Realty net deposits for 1955. As a result, this presumption dropped out of the case, and the burden of going forward with evidence of the correctness of this determination shifted to the respondent. 9 Mertens, Law of Federal Income Taxation, sec. 50.61, p. 155-156. Respondent did not go forward with any evidence regarding his method of arriving at this net deposits figure of $1,445. Neither Shaeiwitz nor Gotwisner testified to investigating the House Realty account as they did with respect to Unity, Mae Ed, and Emray. The record is devoid of any evidence that respondent's representatives prepared work sheets concerning House Realty, or indeed, even examined that corporation's bank records. Thus, petitioner's clear and uncontradicted testimony is the only evidence in the case concerning House Realty's net deposits for 1955. We hold that he has sustained the burden of proving by a preponderance of the evidence that respondent's determination was erroneous with respect to this particular item. Issue 3. Additions to the Tax Respondent has determined certain additions to petitioner's tax for the year 1954 under section 294(d)(1)(A) of the Internal Revenue Code of 1939, *45 and for the year 1955 under section 6654(a) alleging failure to pay estimated income taxes for such years. Furthermore, he determined for both 1954 and 1955 a 25 percent addition to petitioner's tax for failure to file income tax returns as provided under section 6651(a), and a 5 percent addition for negligence or intentional disregard of rules and regulations as prescribed by section 6653(a). Petitioner failed to produce any evidence to controvert these determinations. We are therefore constrained to uphold respondent's determination regarding these additions to petitioner's tax. Issue 4. Statute of Limitations Defense Petitioner contends that the years involved herein are barred by the statute of limitations. He asserted this defense in his original petition filed herein, and we granted respondent's motion that he be required to make a "further and better statement" of the facts he relies upon to establish this defense. The petitioner having failed to comply therewith, we entered an order dismissing his case for lack of prosecution. The petitioner appealed from our order of dismissal, and the Second Circuit held that we erred in dismissing the case on its merits. Schildhaus v. Commissioner, 370 F. 2d 549 *46 (C.A. 2, 1966), certiorari denied 387 U.S. 924 (1967). Concerning petitioner's assertion of the statute of limitations defense, the Second Circuit said in part at page 550: * * * Having failed to comply with the simple requests of the Commissioner and the Tax Court to say when he filed the returns in question, Schildhaus may no longer raise the defense of the Statute of Limitations. * * * We view the above-quoted language as a clear mandate from the Second Circuit that petitioner is precluded from advancing the statute of limitations defense with respect to the years at issue herein. Consequently, we reject his argument to the contrary. Issue 5. Abatement of Assessments Petitioner argues that respondent's abatement of certain assessments previously made with respect to the years involved herein prevents him from making new assessments for such years as a result of the deficiencies asserted herein, citing C. E. McCutchen, 16 B.T.A. 569 (1929), and Carney Coal Co., 10 B.T.A. 1397 (1928). Respondent assessed the deficiencies determined in the instant statutory notice when petitioner took an appeal from the previously discussed order of dismissal without filing an appeal bond as provided *47 by section 7485. However, when the Second Circuit reversed our order, it became necessary for respondent to abate these assessments due to the provisions of section 6213. That section sets forth the general rule that where a petition has been timely filed with this Court, no assessment shall be made with respect to deficiencies placed in issue thereby until the decision entered therein becomes final. None of the exceptions to that general rule are material to the instant case. Petitioner's reliance upon the two abovecited cases is misplaced. In those cases, it was held that the Commissioner could not make new assessments for years barred by the statute of limitations. However, as explained above, petitioner is foreclosed from asserting the statute of limitations defense in this case. It is clear that the respondent is not estopped from making a new assessment where the statute of limitations has not tolled. Alexander T. Sokolow, 22 B.T.A. 349, 351 (1931). 1476 Thus, respondent's abatement of the assessments will not preclude him from making new assessments in this case at the statutorily prescribed time. Issue 6. Due Process of Law Petitioner takes the position that a review of respondent's *48 handling of this case will reveal that he has been denied due process of law, and that the doctrine invoked in Lenske v. United States, 383 F. 2d 20 (C.A. 9, 1967), should be applied herein to overturn the respondent's deficiency determinations. Suffice it to say, we find the facts involved in Lenske, supra, readily distinguishable from those of this case, and a careful review of the entire record before us discloses nothing that could be said to constitute a violation of due process of law. Likewise, we find no merit in petitioner's contentions that the deficiency determinations were arbitrary, capricious, and invalid, or that respondent improperly employed the bank deposits method in this case. In accordance with the foregoing, Decision will be entered under Rule 50. Footnotes
1. Unless otherwise designated, all future statutory references are to the Internal Revenue Code of 1954.↩
*. Respondent concedes that the above-listed checks payable to General Motors Acceptance Corp. totalling $243.02 were not diverted to petitioner's personal use, and are not includable in his gross income for 1954.↩
*. Respondent concedes that the above-listed checks payable to General Motors Acceptance Corp. totalling $243.02 were not diverted to petitioner's personal use, and are not includable in his gross income for 1954.
2. Respondent concedes on brief that the unexplained bank deposits of Unity for the year 1955 should be $14,933.03 rather than the $14,957.03 amount set forth in the deficiency notice.
*. These checks were endorsed to the order of Commercial State Bank.
3. We note that the check at issue to plaintiff's attorney is shown on the Mae Ed work sheet as having been issued on March 16th (the same date as the release), rather than March 18th as shown on respondent's list of unexplained disbursements. This work sheet indicates that the check was cancelled at Commercial State Bank on March 18th.
4. Seven of the forty-one items were checks payable to A. H. Rubin in the amount of $103.75 each, which will be discussed at a later point in the opinion. With respect to the remaining twelve items, petitioner either conceded such disbursements to be personal or his testimony was so vague as not to warrant discussion herein.↩